## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA,
### ORLANDO DIVISION

PATRICIA MCDERMOTT,   )
          )
   Plaintiff,    )
          )
v.           )  Case No. 6:22-cv-976
          )
          )
BOSTON SCIENTIFIC CORPORATION, )  **JURY TRIAL DEMANDED**
          )
   Defendant.   )

## COMPLAINT

COMES NOW Plaintiff Patricia McDermott ("Plaintiff"), by and through her attorneys of record, and, for her cause of action against Defendant Boston Scientific Corporation ("Boston Scientific" or "Defendant"), states and alleges as follows:

## PARTIES

1. Plaintiff is now and was at all times material hereto a citizen and resident of the State of Florida, domiciled in Orlando, Florida. Plaintiff was implanted with and subsequently injured by Defendant's transvaginal mesh devices in Orlando, Florida.

2. Defendant Boston Scientific is a citizen of Delaware and Massachusetts. It is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business at 300 Boston Scientific Way, Marlborough, Massachusetts 01752. Its registered agent office in Florida is Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

3.     All acts and omissions of Defendant, as described herein, were done by its agents, servants, employees, and/or owners acting in the course and scope of their respective agencies, services, employments, and/or ownership.

## JURISDICTION AND VENUE

4.     Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs, and complete diversity of citizenship exists between Plaintiff and Defendant.

5.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this claim occurred in this Judicial District. Plaintiff was implanted with and subsequently injured by Defendant's Pinnacle Mesh Kit ("Pinnacle") and Obtryx Mesh Sling ("Obtryx") in Orlando, Florida, which is in this judicial district, subjecting the Defendant to personal jurisdiction in this action.

## COMMON FACTS

### A. Stress Urinary Incontinence and Pelvic Organ Prolapse

6.     Defendant promotes its pelvic mesh products as devices intended to treat stress urinary incontinence and /or pelvic organ prolapse.

7.     Stress urinary incontinence ("SUI") is the involuntary loss of urine during movement that puts pressure on the bladder, such as laughing, coughing, sneezing, or aerobic or strenuous exercise.  Although incontinence is suffered by both

men and women, it is more common in women and can be caused by menopause or by physical changes that occur in the body during pregnancy or childbirth.

8.    Childbirth, for example, can injure the pelvic floor muscles and ligaments that help support a woman's bladder. If these structures weaken, the bladder can move downward, pushing slightly out of the bottom of the pelvis toward the vagina. The movement of the bladder, or other pelvic organs, such as the urethra, cervix or rectum, is known as pelvic organ prolapse ('POP"). A prolapsed bladder can prevent the muscles that ordinarily force the urethra shut from squeezing as tightly as they should, resulting in an involuntary loss of urine.

9.    Both SUI and POP are, in many cases, treatable. A woman who elects to have SUI or POP surgically treated has several options. SUI, for example, can be corrected through abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure"). SUI also can be surgically addressed using synthetic materials such as suprapubic mid-urethral "slings" placed under the urethra to provide support. Similarly, POP can be corrected through traditional procedures via abdominal or transvaginal surgery. POP also can be surgically addressed using biologic, composite, or synthetic materials.

10.    Surgical mesh products have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using surgical mesh products that were designed for abdominal hernia repair to surgically repair POPs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of SUI.

11.     Manufacturers (such as Boston Scientific) also began to modify the mesh used in hernia repair to be used as "pelvic mesh products" specifically intended to correct SUI and POP. Today, Boston Scientific manufactures and sells pelvic mesh products, as well as pelvic mesh "kits," which can include the surgical mesh and also tissue fixation anchors and insertion tools.

12.     The pelvic mesh products manufactured by Defendant are considered Class II medical devices.

13.     Unlike Class III medical devices, such as an artificial heart or an Automated External Defibrillator, Class II devices do not require "approval" by the Food and Drug Administration ("FDA"). Whereas Class III devices cannot be sold until the manufacturer demonstrates to the FDA, through adequate and well-controlled clinical trials, that the proposed device is safe and effective, there is no such requirement for Class II devices.

14.     Under the FDA's "Substantial Equivalence" process under Section 510(k) of the Food, Drug and Cosmetic Act, a manufacturer must provide a premarket notification that allows the FDA to determine whether a medical device is substantially equivalent to a "predicate device." A predicate device is one that the FDA has placed into one of three categories and "cleared" for marketing.

15.     The "premarket notification" process -- for Class II devices -- is not focused on whether the device is safe and effective, but rather is concerned with whether the proposed device is substantially equivalent to an existing predicate device that was already cleared for marketing by the FDA.

4

16.     At all times material to this action, Defendant designed, tested, patented, manufactured, packaged, labeled, marketed, sold, and distributed a line of pelvic mesh products intended to treat POP and SUI. Each of these products was cleared for sale in the United States after the Defendant made assertions to the FDA of "Substantial Equivalence" under Section 510(k). This clearance process does not require the applicant to prove safety or efficacy.

17.     One of the pelvic mesh products that Defendant designed, tested, patented, manufactured, packaged, labeled, promoted, marketed, sold, and distributed was the Obtryx, which was intended to treat SUI.

18.     Another pelvic mesh product that Defendant designed, tested, patented, manufactured, packaged, labeled, promoted, marketed, sold, and distributed was the Pinnacle, which was intended to treat POP.

19.     Defendant was aware, or should have been aware, of the dangers inherent in the Obtryx and Pinnacle devices (hereinafter, collectively referred to as "Products"), notwithstanding the fact that the Products were "cleared" for sale by the FDA.

### B. Plaintiff's Medical History and Experience

20.     Plaintiff was implanted with the Products during surgery to treat POP on June 21, 2011. Her implanting surgeon was Dr. Stephen Dobkin, and the surgery was performed at Florida Hospital in Orlando, Florida.

21.     A little less than a month after Plaintiff's implant, the FDA released a Public Health Notification on July 13, 2011 stating among other things:

a. The FDA is issuing this update to inform you that serious complications associated with surgical mesh for transvaginal repair of POP are **not rare**.

b. Mesh used in transvaginal POP repair introduces risks not present in traditional non-mesh surgery for POP repair.

c. Mesh erosion can require multiple surgeries to repair and can be debilitating for some women. In some cases, even multiple surgeries will not resolve the complication.

d. *Mesh contraction* (shrinkage) is a *previously unidentified risk* of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA since the Oct. 20, 2008 *FDA Public Health Notification*. Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain.

e. Both mesh erosion and mesh contraction may lead to severe pelvic pain, painful sexual intercourse or an inability to engage in sexual intercourse.

f. Recognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications.

g. Removal of mesh due to mesh complications may involve multiple surgeries and significantly impair the patient's quality of life. Complete removal of mesh may not be possible and may not result in complete resolution of complications, including pain.

22.   The products were implanted in Plaintiff for their intended use, the treatment of POP and SUI.

23.   Plaintiff's surgery was performed without intraoperative complications.

24.   On November 1, 2018, with surgical indications including pelvic pain and mesh eroding into her vagina, Plaintiff underwent surgery to revise and partially remove the defective Products. The surgery was performed by Dr. Rakesh Patel in Orlando, Florida.

25.     On May 28, 2019, after experiencing pelvic pain, bleeding and incontinence, Plaintiff presented to Dr. Patel. Dr. Patel noted additional exposed mesh in multiple areas and recommended an additional surgery to attempt to remove the remaining mesh. However, Dr. Patel noted that it may not be possible to remove all of the mesh from inside Plaintiff.

26.     The Products were designed, tested, manufactured, marketed, promoted, and distributed by Defendant.

27.     As a result of having the Products implanted in her, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury and permanent and substantial physical deformity, has undergone and likely will continue to undergo corrective surgery or surgeries, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses.

28.     Until recently, Plaintiff, in the exercise of due diligence, could not reasonably have discovered the cause of her injuries, including, but not limited to, the defective design and/or manufacturing of the Products implanted inside of her.

29.     The acts, conduct, and omissions of Defendant, as alleged throughout this First Amended Complaint were fraudulent, willful, and malicious and were done with a conscious disregard for the rights of Plaintiff and other users of the Product and for the primary purpose of increasing Defendant's profits from the sale and distribution of the Product.

30.     The Product implanted in Plaintiff was used in a reasonably foreseeable manner.

## COUNT I: NEGLIGENCE

31.     Plaintiff incorporates by reference paragraphs 6 - 30 of this Complaint as if fully set forth in this Count.

32.     At all times material hereto, Defendant had a duty to Plaintiff and to other foreseeable users of the Products to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, labeling, assembling, packaging, distribution, detailing, promotion and sale of the Products.

33.     Defendant had a further duty to provide adequate and sufficient instructions concerning the proper use of the Products, as well as warnings of the risks and dangers associated with using the Products, to Plaintiff and to other foreseeable users of the Products.

34.     Defendant breached its duties to Plaintiff when it failed to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, testing, labeling, assembling, packaging, distribution, detailing, promotion and sale of its Products so as to avoid unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff.

35.     Defendant failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the pelvic mesh products.

36.     The Products implanted in Plaintiff were unreasonably dangerous and defective for reasons that include, but are not limited to, the following:

a) The use of polypropylene material in the Products and the immune reaction that results from such material, causing adverse reactions and injuries;

b) The design of the Products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c) Biomechanical issues with the design of the Products, including, but not limited to, the propensity of the Products to contract or shrink inside the body that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d) The use and design of arms and anchors in the Products, which, when placed in women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e) The propensity of the Products to "creep" or to gradually elongate and deform when subject to prolonged tension inside the body;

f) The inelasticity of the Products, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

g) The propensity of the Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction and results in continuing injury over time;

h) The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturer's instructions;

i) The products degrade over time, cause chronic foreign body reactions, fibrotic bridging, mesh contracture / shrinkage, fraying, deformation, roping, rolling and curling of the mesh;

j) Lacked adequate studies to establish safety and effectiveness for permanent human implantation to treat SUI and/or POP;

k) Disregarded prior experience with the Protegen device when manufacturing the Mesh Products, like the Obtryx and the Pinnacle;

l) Directions For Use ("DFU") BSC provided with all Mesh Products do not fully disclose or adequately warn about the Mesh Products' known or knowable risks, adverse reactions, and characteristics; and

m) The use of polypropylene material in the Products and the failure to provide adequate directions for use (DFU) and training.

n) Boston Scientific failed to design and establish a safe, effective procedure for removal of their pelvic mesh products; therefore, in the event of a failure, injury, or complication it is impossible to easily and safely remove.

o) Defendant used non-medical grade material and counterfeit material illegally smuggled in from China to make their medical devices.

p) The pore size and stiffness of the devices were unsafe and resulted in unnecessary complications to women and created an unacceptable risk of chronic pain and the mesh ripping through vaginal tissue.

37.      Defendant also breached its duty to adequately and sufficiently warn Plaintiff and her healthcare providers and other foreseeable users of the Products of the Products' propensity to erode, the rate and manner of mesh erosion, the risk of chronic infections resulting from implantation of the Product, the risk of vaginal scarring as a result of implantation of the medical devices, the risk of recurrent severe pelvic pain and other pain resulting from the implantation of the Products, the need for corrective or revisionary surgery to adjust or repair the Products, or the overall severity of complications that could arise as a result of implantation of the Products.

38.     Defendant's pelvic mesh products incorporate a monofilament polypropylene mesh intended for the treatment of POP and/or SUI. Despite claims that this material is inert, the emerging scientific evidence suggests that this material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving Defendant's pelvic mesh products containing this material. This immune response promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh. Moreover, the mesh migrates within the surrounding tissues causing irreparable damage to the tissue including nerve endings residing within the tissues. Damaged nerve endings do not regenerate and lead to debilitating neuromas suffered by patients such as Plaintiff.

39.     Boston Scientific made claims and representations in documents it submitted to the FDA, in its reports to the public and to healthcare professionals, and in advertisements that the Products did not present serious health risks.

40.     These and other representations made by Boston Scientific were false when made and/or were made with the pretense of actual knowledge, when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

41.     These and other representations made by Boston Scientific were made with the intention of deceiving Plaintiff, Plaintiff's healthcare professionals, and other members of the healthcare community and were made in order to induce Plaintiff and her healthcare professionals to rely on misrepresentations and caused Plaintiff to

purchase, rely, use, and request the Products and her healthcare professionals to dispense, recommend, or prescribe the Products.

42.    Defendant's pelvic mesh products have been and continue to be marketed to the medical community and to patients as safe, effective, reliable, medical devices implanted by safe and effective minimally invasive surgical techniques for the treatment of medical conditions, primarily POP or SUI, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing pelvic mesh products.

43.    The Defendant has marketed and sold its pelvic mesh products to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care providers at medical conferences, hospitals, and private offices and include the provision of valuable cash and non-cash benefits to health care providers. Also utilized are documents, brochures, and websites offering exaggerated and misleading expectations as to the safety and utility of the products.

44.    Contrary to the Defendant's representations and marketing to the medical community and to the patients themselves, the Defendant's pelvic mesh products have high failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making them defective under the law. The Defendant consistently

has underreported and withheld information about the propensity of its pelvic mesh products to fail and cause injury and complications, has misrepresented the efficacy and safety of its products, and, through various means and media, has actively and intentionally been misleading the FDA, the medical community, patients, and the public at large.

45.    Defendant knew and had reason to know that the Products could and would cause severe and grievous personal injury to its users and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

46.    Boston Scientific knew or had reason to know that Plaintiff and her physicians and other healthcare providers had no way to determine the truth behind Defendant's concealment and omissions and that these included material omissions of facts surrounding the use of the Products, as described in detail above.

47.    In reliance upon these false representations, Plaintiff was induced to and did use the Products, thereby sustaining severe and permanent personal injuries and damages.

48.    Had Plaintiff or her treating physician known of the unreasonably dangerous risks associated with the Products at the time of her implant surgery, such knowledge would have affected the treating physician's use of the devices and Plaintiff would not have consented to the implantation of the devices.

49.    As a direct and proximate result of Defendant's breaches of duty, as described above, Plaintiff has suffered serious and permanent physical and mental

injuries. Additionally, Plaintiff has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

50.     As a direct, proximate, and foreseeable result of Defendant's negligence, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT II:  STRICT LIABILITY – DESIGN DEFECT

51.     Plaintiff incorporates by reference paragraphs 6 - 30 of this Complaint as if fully set forth in this Count.

52.     The Products implanted in Plaintiff were not reasonably safe for their intended uses and were defective as described herein with respect to their design. The Products' design defects include, but are not limited to:

a) The use of polypropylene material in the Products and the immune reaction that results from such material, causing adverse reactions and injuries;

b) The design of the Products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c) Biomechanical issues with the design of the Products, including, but not limited to, the propensity of the Products to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d) The use and design of arms and anchors in the Products, which, when placed in women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e) The propensity of the Products to "creep" or to gradually elongate and deform when subject to prolonged tension inside the body;

f) The inelasticity of the Products, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted,

14

and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

g) The propensity of the Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction and results in continuing injury over time;

h) The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturer's instructions; and

i) The use of polypropylene material in the Products and the failure to provide adequate directions for use (DFU) and training.

j) Defendant used non-medical grade material and counterfeit material illegally smuggled in from China to make their medical devices.

k) The pore size and stiffness of the devices were unsafe and resulted in unnecessary complications to women and created an unacceptable risk of chronic pain and the mesh ripping through vaginal tissue.

53.     Feasible and suitable alternative designs, as well as suitable alternative procedures and instruments for implantation, have existed at all times relevant as compared to the pelvic mesh products.

54.     The Products implanted into Plaintiff were in the same or substantially similar condition as they were when they left the possession of Boston Scientific and in the condition directed by and expected by the Defendant.

55.     Plaintiff and her physicians foreseeably used and implanted the Products and did not misuse or alter the Products in an unforeseeable manner.

56.     The medical and scientific literature studying the effects of polypropylene pelvic mesh, like Defendant's pelvic mesh products, have examined each of these injuries, conditions, and complications and determined that they are, in fact, causally

related to the mesh itself and do not often implicate errors related to the implantation of the devices.

57.    As a direct and proximate result of the Products' aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo future medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

58.    Defendant is strictly liable to Plaintiff for designing, marketing, labeling, packaging, and selling the defective products.

## **COUNT III:  STRICT LIABILITY – MANUFACTURING DEFECT**

59.    Plaintiff incorporates by reference paragraphs 6 - 30 of this Complaint as if fully set forth in this Count.

60.    The Products implanted in Plaintiff were not reasonably safe for their intended uses and were defective as described herein as a matter of law with respect to their manufacture, in that they deviated materially from Defendant's design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to Plaintiff.

61.    At all relevant times Boston Scientific was the manufacturer of the Obtryx and Pinnacle Mesh Products.

62.     Defendant designed, manufactured, prepared, assembled, marketed, labeled, distributed and sold the Products.

63.     The Defendant designed the Products as permanent implants for long term use within the human body.

64.     However, due to the manufacturing defect of the mesh systems, the devices were not safe or effective for long term use.

65.     Manufacturing issues include using non-medical grade material, smuggling in counterfeit material from China to manufacture the devices and inadequate specifications that were not adhered to in the manufacturing of Plaintiff's devices.

66.     The Defendant's mesh products are not compatible with human tissue and promote an immune response in a large subset of the population.

67.     The Defendant's pelvic mesh products have high failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making them defective under the law.

68.     The Products implanted into Plaintiff were in the same or substantially similar condition as it was when they left the possession of Boston Scientific and in the condition directed by and expected by the Defendant.

69.     The pelvic mesh products were at all times utilized and implanted in a manner foreseeable to the Defendant, as Defendant generated the instructions for use,

created the procedure for implanting the devices, and trained the implanting physicians.

70.     As a direct and proximate result of the Products' aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and/or corrective surgery and hospitalization, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

71.     Defendant is strictly liable to Plaintiff for manufacturing and selling the defective Products.

## COUNT IV:  STRICT LIABILITY – FAILURE TO WARN

72.     Plaintiff incorporates by reference paragraphs 6 - 30 of this Complaint as if fully set forth in this Count.

73.     Defendant had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff, Plaintiff's healthcare providers, and the FDA.

74.     The Products implanted in Plaintiff were not reasonably safe for their intended uses and were defective as described herein as a matter of law due to their lack of appropriate and necessary warnings. Specifically, Defendant did not provide sufficient or adequate warnings regarding, among other subjects:

a) The Products' propensities to contract, retract, and/or shrink inside the body;

b) The Products' propensities for degradation, fragmentation, disintegration and/or creep;

c) The Products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

d) The rate and manner of mesh erosion or extrusion;

e) The risk of chronic inflammation resulting from the Products;

f) The risk of chronic infections resulting from the Products;

g) The risk of permanent vaginal or pelvic scarring as a result of the Products;

h) The risk of recurrent, intractable pelvic pain and other pain resulting from the Products;

i) The need for corrective or revision surgery to adjust or remove the Products;

j) The severity of complications that could arise as a result of implantation of the Products;

k) Treatment of SUI and/or POP with the Products are no more effective than feasible available alternatives;

l) Treatment of SUI and/or POP with the Products exposes patients to greater risk than feasible available alternatives;

m) Treatment of SUI and/or POP with the Products make future surgical repair more difficult than feasible available alternatives;

n) Use of the Products put the patient at greater risk of requiring additional surgery than feasible available alternatives;

o) Removal of the Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

p) Complete removal of the Products may not be possible and may not result in complete resolution of the complications, including pain;

q) The nature, magnitude, and frequency of complications that could

19

arise as a result of implantation of the Products.

r) The material was never intended to be used in a medical device permanently implanted in the body, the material was non-medical grade, and the material was counterfeit polypropylene smuggled in from China.

75.     Boston Scientific acted unreasonably in failing to undertake its duties to properly know the qualities of its products and, in representations to Plaintiff and/or to Plaintiff's health care providers, concealed and intentionally omitted the following material information:

a) That the Products were not as safe as other products and procedures available to treat incontinence and/or prolapse;

b) That the risk of adverse events with the Products were higher than with other products and procedures available to treat incontinence and/or prolapse;

c) That the risk of adverse events with the Products were known by Boston Scientific and was not adequately tested;

d) That the limited clinical testing revealed the Products had a higher risk of adverse effects in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

e) That Boston Scientific failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

f) That Boston Scientific was aware of dangers in its pelvic mesh products, including the pelvic mesh systems, in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

g) That the pelvic mesh systems were dangerous and caused adverse side effects, including, but not limited to, higher incidence of erosion and failure at a much more significant rate than other products and procedures available to treat incontinence and/or prolapse;

20

h) That patients frequently would need revisionary surgery due to changes in the structure of the Products that would cause them to be become loose or shift position within the body;

i) That patients needed to be monitored more regularly than usual while using the Products and, in the event the Products needed to be removed, that the procedure to remove the Products had a very high failure rate and/or needed to be performed repeatedly.

j) That material BSC was using carried a specific safety warning to never be used as a permanent implant in the human body.

k) That material BSC was using to make their mesh was counterfeit and imported from China.

l)  That BSC rushed the Products to market against the concerns of consultants and employees.

m) That BSC was aware of safety issues with design of the Products' barbs/anchors and the pain they caused to patients and lack of effectiveness of anchoring mechanisms.

o) That BSC was aware the Products were not as safe or efficacious as other alternatives.

p) That BSC was unable to find any surgeons who would publish favorable data on the Products other than Scott Serels, a doctor they had paid money to as a mesh consultant for years.

q) That BSC internal risk assessments concluded there was lack of data to support the safety and efficacy of the Products.

r) That BSC received complaints about the design of Products, including from their own consultants, only to conceal them and not make changes to the design.

76.    Boston Scientific was under a duty to disclose to Plaintiff and her physicians the defective nature of the Products, including, but not limited to, the heightened risks of erosion, failure, and permanent injury.

77.    Boston Scientific misrepresented to the medical and healthcare community, Plaintiff, the FDA, and the public at large that the pelvic mesh products had been tested and were found to be safe and effective for the purposes of treating SUI and POP.

78.    These representations were made by Boston Scientific with the intent of inducing Plaintiff, the medical community, and the public to recommend, prescribe, dispense, and purchase the pelvic mesh products for use as a means of treatment for SUI and/or POP, all of which evinced an indifference to the health, safety, and welfare of Plaintiff.

79.    Boston Scientific had sole access to material facts concerning the defective nature of the Product and its propensity to cause serious and dangerous side effects and, hence, cause dangerous injuries and damage to women who used the Products.

80.    At the time these representations were made by Boston Scientific and at the time Plaintiff used the Products, she was unaware of the falsehood of these representations, and reasonably believed them to be true.

81.    Defendant's concealment and omissions of material facts concerning the safety of its pelvic mesh products were made to cause Plaintiffs physicians and healthcare providers to purchase, prescribe, and/or dispense the Products; and/or to mislead Plaintiff into reliance and cause Plaintiff to use the Products.

82.    The Defendant provided incomplete, insufficient, and misleading training and information to physicians in order to increase the number of physicians

utilizing the pelvic mesh products and, thus, increase the sales of the pelvic mesh products, leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

83.     Boston Scientific intentionally made material misrepresentations to the medical community and public, including Plaintiff, regarding the safety of the Products, specifically that they did not have dangerous and/or serious adverse health safety concerns and that they were as safe as other means of treating SUI and/or POP.

84.     Defendant intentionally failed to inform the public, including Plaintiff, of the high failure rate, erosion, the difficulty of removing the Products, and the risk of permanent injury.

85.     Instead, Boston Scientific chose to over-promote the safety, efficacy, and benefits of the Products.

86.     Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Products, she would not have purchased, used, or relied on the Products.

87.     As a direct and proximate result of the Products' aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

88.     Defendant is strictly liable to Plaintiff for its failure to provide adequate

and sufficient warnings to Plaintiff and to foreseeable users of the defective Products.

## COUNT V: BREACH OF EXPRESS WARRANTY

89.    Plaintiff incorporates by reference paragraphs 6 - 30 of this Complaint as if fully set forth in this Count.

90.    Defendant made assurances as described herein to the general public, hospitals, and health care professionals that the Products were safe and reasonably fit for their intended purposes.

91.    As a result of Defendant's research and testing, or lack thereof, it distributed false information including, but not limited to, assuring Plaintiff, the public, and Plaintiff's healthcare providers and physicians that the pelvic mesh products were safe for use as a means of providing relief from SUI and/or POP and was as safe or safer than other products and/or procedures available and on the market. As a result of Defendant's research and testing, or lack thereof, Defendant intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, Plaintiff, and the public at large.

92.    The information that Boston Scientific distributed to the public, the medical community, the FDA, and Plaintiff included, but was not limited to, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading and contained omissions and concealment of the truth about the dangers of the use of the Products.

93.     Defendant's intent and purpose in making these misrepresentations were to deceive the public, the medical community, and Plaintiff; to gain the confidence of the public, the medical community, and Plaintiff; to falsely assure the public, the medical community, and Plaintiff of the quality and fitness for use of the Products; and to induce Plaintiff, the public and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Products.

94.     Boston Scientific utilized direct-to-consumer advertising to market, promote, and advertise the Products.

95.     At the time the representations were made, Plaintiff and her healthcare providers did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the Products. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Boston Scientific, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendant's misrepresentations.

96.     Boston Scientific recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the Products to the public at large for the purpose of influencing the sales of a pelvic mesh product known to be dangerous and defective and/or not as safe as other alternatives.

97.     Plaintiff and/or her healthcare provider chose the Product based upon Defendant's warranties and representations as described herein regarding the safety and fitness of the Products.

98.     Plaintiff, individually, and/or by and through her physician, reasonably

relied upon Defendant's express warranties and guarantees that the Products were safe, merchantable, and reasonably fit for their intended purposes – and stated the Products were permanent, safe, approved by the FDA, had low complications, high success rates and utilized material that performed better than alternative options available to the plaintiff.

99.    Defendant breached these express warranties because the Products implanted in Plaintiff were unreasonably dangerous and defective as described herein and not as Defendant had represented.

100.    Defendant's breach of its express warranties resulted in the implantation of unreasonably dangerous and defective Products in the body of Plaintiff, placing Plaintiff's health and safety in jeopardy.

101.    As a direct and proximate result of Defendant's breach of the aforementioned express warranties, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT VI: NEGLIGENT MISREPRESENTATION

102.    Plaintiff incorporates by reference paragraphs 6 – 30, 35 – 36 and 38 - 48 of this Complaint as if fully set forth in this Count.

103.    As described in detail herein, Defendant made numerous false statements

of material facts regarding the safety and efficacy of the Products to healthcare providers, and the community at large, including Plaintiff and Plaintiff's physicians. These statements were contained in advertisements, promotional materials, the Products' DFUs, publications in journals, consulting and/or educational materials intended for healthcare providers, and other media.

104. As described in detail herein, Defendant knew or should have known that these statements were false.

105. In making these false statements, Defendant intended that Plaintiff and her healthcare providers rely on the misrepresentations so that they would purchase and use the Products as opposed to other, safer and more efficacious forms of treatment for SUI and/or POP.

106. As described in detail herein, Plaintiff and her treating physicians were not aware of the true extent of the risks of injury associated with the use of the Products at the time of implant, and they reasonably relied on the representations made by Defendant regarding the safety and efficacy of the Products to influence their decisions to purchase and implant the Products.

107. As a direct and proximate result of the Defendant's negligent misrepresentations, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT VII: FRAUDULENT CONCEALMENT

108.    Plaintiff incorporates by reference paragraphs 6 – 30, 35 – 36 and 38 - 48 of this Complaint as if fully set forth in this Count.

109.    Defendant falsely and fraudulently have represented and continue to represent to the medical and healthcare community, Plaintiff, her treating physicians, and the public that the Products had been tested and were found to be safe and effective.

110.    Specifically, Defendant made the conscious decision to obtain counterfeit mesh material from China for use in the Products, but concealed that fact in communications to the healthcare community, including those made to Plaintiff's physicians as described herein. The material actually used to make the Products was not the medical grade material Defendant represented it was using to the medical community, including Plaintiff's healthcare providers.

111.    In addition, Defendant hired and paid physician consultants specifically to tout the alleged benefits of the Products to the medical community, including Plaintiff's healthcare providers, but they specifically withheld the true risk profile in these representations.

112.    Defendant represented to the medical community, including Plaintiff's healthcare providers, that the Products had been adequately tested and found to be safe and effective, when Defendant knew that was not true.

113.    The representations made by Defendant were, in fact, false and the omissions were misleading and fraudulent. When Defendant made the representations

and omissions, Defendant knew and / or had reason to know that those representations were false and the omissions were misleading, and Defendant willfully, wantonly, and recklessly disregarded the inaccuracies in the representations and the dangers and health risks to users of the Products, including Plaintiff and her treating physicians.

114.   These representations and omissions were made by Defendant with the intent of defrauding and deceiving the medical community, Plaintiff, her treating physicians, and the public, and also inducing the medical community, Plaintiff, her treating physicians, and the public, to recommend, prescribe, dispense, and purchase the Products for use as a means of treatment for SUI and POP, all of which evinced a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff.

115.   In representations to Plaintiff and / or to Plaintiff's healthcare providers, Defendant fraudulently concealed and intentionally omitted the statements described herein and below which were material in nature:

a) That the Defendant's Products were not as safe as other products, treatments and procedures available to treat SUI and POP;

b) That the risk of adverse events with the Defendant's Products were higher than with other products, treatments and procedures available to treat SUI and POP;

c) The Defendant's Products were not adequately tested;

d) That Defendant deliberately failed to follow up on the adverse results from formal and informal reports from physicians and other healthcare providers and buried and / or misrepresented those findings;

e) That Defendant was aware of dangers in the Defendant's Products in addition to and above and beyond those associated with other products, treatments and procedures available to treat SUI and POP;

f) That the Defendant's Products were defective, and caused dangerous and adverse side effects, including but not limited to higher incidence of erosions, extrusions, adverse tissue response and rejection, contraction, migration, trauma, groin pain, vaginal pain, failure, and revision surgeries at a much more significant rate than other products, treatments and procedures available to treat incontinence;

g) That patients needed to be monitored more regularly than usual while using the Defendant's Products and that in the event the Products needed to be attempted to revise or be removed that the procedures to remove segments of the product had a very high failure rate and / or needed to be performed repeatedly;

h) That the Defendant's Products were manufactured negligently;

i) That the Defendant's Products were manufactured defectively;

j) That the Defendant's Products were designed negligently, and designed defectively.

116.   Defendant was under a duty to disclose to Plaintiff and her physicians the defective nature of the Defendant's Products, including, but not limited to, the heightened risks of erosion, pain, failure, and permanent injury, and the design characteristics which exacerbated or created unreasonable risks, and material safety information about the device.

117.   Defendant had sole access to material facts concerning the defective nature of the Products and their propensity to cause serious and dangerous side effects and hence, cause dangerous injuries and damage to persons who used the Defendant's device.

118.   Defendant's concealment and omissions of material fact concerning the safety of the Products were made purposefully, willfully, wantonly, and / or recklessly to mislead, to cause Plaintiff's treating physician to recommend, purchase, prescribe, and / or dispense the device; and / or to mislead Plaintiff into reliance and cause Plaintiff to have the devices permanently implanted in her body.

119.   At the time these representations and omissions were made by Defendant, and at the time Plaintiff was implanted with the devices, Plaintiff and her treating physician were unaware of the falsehood of these representations, misleading nature of omissions and statements, and reasonably believed them to be true.

120.   Defendant knew and had reason to know that its Products could and would cause severe and grievous personal injury to the patients implanted with the devices, and that the devices were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

121.   In reliance upon these false representations, Plaintiff and her treating physician were induced to, and did use the Products, thereby causing Plaintiff to sustain severe personal injuries and damages. Defendant knew or had reason to know that Plaintiff and her treating physician and other healthcare providers had no way to determine the truth behind Defendant's concealment and omissions, and that these included material omissions of facts surrounding the use of the Defendant's Products, as described in detail herein.

122.   Plaintiff and her treating physician reasonably relied on revealed facts provided by Defendant, but were unaware of purposefully suppressed and concealed

31

facts that were critical to understanding the real dangers inherent in the use of the Defendant's Products.

123.   If Plaintiff, her treating physician, or both would have been made aware of these purposefully suppressed and concealed facts, as set forth herein, Plaintiff would not have used or consented to the implantation of the Products and her treating physician would have used the device differently, warned about it differently or not used it at all.

124.   Having knowledge based upon Defendant's research and testing, or lack thereof, Defendant blatantly and intentionally distributed false information, including but not limited to assuring Plaintiff, the public, and Plaintiff's healthcare providers and physicians, that the Defendant's Products were safe for use as a means of providing relief from SUI and POP and were as safe or safer than other products, treatments and/or procedures available and on the market. As a result of Defendant's research and testing, or lack thereof, Defendant intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, Plaintiff, her treating physician, and the public at large.

125.   Defendant had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff and Plaintiff's healthcare providers.

126.   The information distributed to the public, the medical community, Plaintiff, and her treating physicians by Defendant included, but was not limited to websites, information presented at medical and professional meetings, information

disseminated by sales representatives to physicians and other medical care providers, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Defendant's Products.

127.    Defendant intentionally failed to inform the public, including Plaintiff and her treating physicians, of the high failure rate including erosion, extrusion, contraction, groin and vaginal pain, the difficulty or impossibility of removing the mesh, and the risk of significant irreversible injury.

128.    Defendant chose to over-promote the purported safety, efficacy and benefits of the Defendant's Products instead.

129.    Defendant's intent and purpose in making these misrepresentations was to deceive and defraud the public, the medical community, Plaintiff, and her treating physicians; to gain the confidence of the public, the medical community, Plaintiff, and her treating physicians; to falsely assure them of the quality and fitness for use of the Products; and induce Plaintiff, and her treating physician, the public and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Defendant's Products.

130.    Defendant made claims and representations in its promotional materials to healthcare professionals and patients that the Defendant's Products had innovative beneficial properties that increased the safety of the devices which Defendant knew or should have known were false and misleading with the intention for patients and

doctors to rely on the claims and choose Defendant's Products over safer alternatives.

131.   These representations, and others made by Defendant, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist and were made recklessly and without regard to the true facts.

132.   These representations, and others made by Defendant, were made with the intention of deceiving and defrauding Plaintiff, Plaintiff's healthcare professionals and other members of the healthcare community, and were made in order to induce Plaintiff and her healthcare professionals to rely on misrepresentations and caused Plaintiff to purchase, rely, use, and request the Defendant's Products and her healthcare professionals to dispense, recommend, or prescribe Defendant's devices.

133.   Defendant recklessly and / or intentionally represented false, dangerous, and serious health and safety concerns inherent in the use of Defendant's Products to the public at large, for the purpose of influencing the sales of products known to be dangerous and defective, and / or not as safe as other alternatives.

134.   Defendant willfully and intentionally failed to disclose the truth, failed to disclose material facts, and made false representations for the purpose of deceiving and lulling Plaintiff and her treating physician into a false sense of security, so that Plaintiff and her treating physician would rely on Defendant's representations, and Plaintiff would request and purchase the Defendant's Products and that her healthcare providers would dispense, prescribe, and recommend Defendant's Products.

135.   Defendant utilized direct-to-consumer advertising to market, promote, and advertise the Defendant's Products.

34

136.   At the time the representations were made, Plaintiff and her treating physician did not know the truth about the dangers and serious health and / or safety risks inherent in the use of the Defendant's Products. Plaintiff did not discover the true facts about the dangers and serious health and / or safety risks, nor did Plaintiff discover the false representations of Defendant, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendant's misrepresentations.

137.   Defendant's wrongful conduct constitutes fraud and deceit and was committed and perpetrated willfully, wantonly, and / or purposefully on Plaintiff.

138.   As a direct and proximate result of the Defendant's conduct, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

139.   Accordingly, Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule, and fraudulent concealment.

140.   Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had

been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

141.   Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages and their relationship to the Product was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's action was filed well within the applicable statutory limitations period.

142.   The running of the statute of limitations in this action is tolled due to equitable tolling. Defendant is estopped from asserting a statute of limitations defense due to Defendant's fraudulent concealment through affirmative misrepresentations and omissions from Plaintiff and Plaintiff's physicians of the true risks associated with the Products. As a result of Defendant's fraudulent concealment, Plaintiff and Plaintiff's physicians were unaware, and could not have known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendant.

## COUNT VIII:  GROSS NEGLIGENCE

143.   Plaintiff incorporates by reference paragraphs 6 – 30, 35 – 36 and 38 - 48 of this Complaint as if fully set forth in this Count.

144.   In committing the acts and / or omissions set forth herein that directly and proximately caused Plaintiff's injuries, as set forth herein, Defendant breached its duty to Plaintiff and demonstrated a conscious, reckless, willful, and wanton indifference to and disregard of the consequences of its actions and / or omissions.

145.   Boston Scientific has known and continues to know that some of the predicate products for their pelvic mesh products had high failure and complication rates, resulting in the recall of some of these predicate devices; that there were and are differences between the Defendant's pelvic mesh products and some or all of the predicate products, rendering them unsuitable for designation as predicate products; that significant differences exist and existed between the pelvic mesh products and their predecessor and predicate products, such that the disclosures to the FDA were and are incomplete and misleading; and that the pelvic mesh products were and are causing numerous patients severe injuries and complications. The Defendant suppressed this information and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, or the patients. As a result, the Defendant actively and intentionally misled and continues to mislead the public, including the medical community, health care providers, and patients, into believing that the pelvic mesh products and the procedures for their implantation were and are safe and effective, This lead to the prescription for and implantation of the Products into Plaintiff.

146.   The injuries, conditions, and complications suffered by women who have been implanted with Defendant's pelvic mesh products include, without limitation:

mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, the recurrent prolapse of organs, and, in many cases, the women have been forced to undergo intensive medical treatment including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

147.   Again, Boston Scientific had sole access to material facts concerning the defective nature of the Products and their propensity to cause serious and dangerous side effects and, hence, cause dangerous injuries and damage to women who used the Products.

148.   Defendant was grossly negligent by showing a complete indifference for the safety and health of Plaintiff and others similarly situated in negligently designing, packaging, labeling, marketing, advertising, promoting, distributing, and selling defective and unreasonably dangerous products and in negligently failing to warn Plaintiff of the significant risks and complications associated with its devices, as set forth above.

149.   In light of the knowledge Defendant had concerning the risks and complications associated with its devices, as set forth above, Defendant continued to show an utter disregard and complete indifference for the safety of Plaintiff by failing

to provide adequate warnings concerning the risks and complications associated with the Products, making material misrepresentations and placing profits from sales of its device over the safety of patients receiving its devices.

150.    The wrongs done by Defendant were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff for which the law will not allow, and for which Plaintiff seeks exemplary damages, in that Defendant's conduct, including the failure to comply with applicable industry standards, was specifically intended to cause substantial injury to Plaintiff; or when viewed objectively from Defendant's standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiff, and Defendant actually was subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff; or included a material representation that was false, with Defendant knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff.

151.    As a direct and proximate result of Defendant's gross negligence, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT IX: PUNITIVE DAMAGES

152.    Plaintiff incorporates by reference paragraphs 6 – 30, 35 – 36 and 38 - 48 of this Complaint as if fully set forth in this Count.

153.    Defendant sold the Products to the healthcare providers of Plaintiff in the State of Florida and throughout the United States without doing adequate testing to ensure that the Product was reasonably safe for implantation in the female pelvic area.

154.    Defendant sold the Products to Plaintiff's health care providers and other health care providers in the State of Florida and throughout the United States in spite of its knowledge that the Products can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this Complaint, thereby causing severe and debilitating injuries suffered by Plaintiff and numerous other women.

155.    Defendant ignored reports from patients and health care providers throughout the United States and elsewhere of the Products' failures to perform as intended, which lead to the severe and debilitating injuries suffered by Plaintiff and numerous other women. Rather than doing adequate testing to determine the cause of these injuries or to rule out the Products' designs or the processes by which the Products are manufactured as the cause of these injuries, Defendant chose instead to continue to market and sell the Products as safe and effective.

156.    Defendant withheld material information from the medical community and the public in general, including Plaintiff, regarding the safety and efficacy of the Products.

157.    Defendant knew and recklessly disregarded the fact that the Products caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat SUI and/or POP.

158.    Defendant misstated and misrepresented data and continues to misrepresent data so as to minimize the perceived risk of injuries caused by the Products.

159.    Notwithstanding the foregoing, Defendant continues to aggressively market the Products to consumers, without disclosing the true risks associated with the Products.

160.    Defendant knew of the Products' defective and unreasonably dangerous nature, but continued to mislead physicians and patients and to manufacture, market, distribute, and sell the Products so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff.

161.    Defendant continues to conceal and/or fail to disclose to the public, including the Plaintiff, the serious complications associated with the use of the Products to ensure continued and increased sales of the Products.

162.    Defendant's conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that the Court enter judgment in her favor against Defendant for actual, compensatory, and punitive damages, plus attorneys' fees and expenses, costs, interest, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action.


Dated:  June 1, 2022                           Respectfully submitted,


                                               **THE MAHER LAW FIRM**

                                               /s/ *Jason R. Fraxedas*
                                               Jason R. Fraxedas, Esq.
                                               Florida Bar # 63887
                                               Matthew S. Mokwa, Esq.
                                               Florida Bar # 47761
                                               398 West Morse Blvd, Suite 200
                                               Winter Park, FL 32789
                                               407-839-0866
                                               jrfraxedas@maherlawfirm.com
                                               mmokwa@maherlawfirm.com